**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LEBANON FARMS DISPOSAL, INC.,** | : | |
| | : | **CIVIL ACTION NO. 1:CV-03-0682** |
| **Plaintiff,** | : | |
| | : | **(Judge Kane)** |
| **v.** | : | |
| | : | |
| **COUNTY OF LEBANON AND THE** | : | |
| **GREATER LEBANON REFUSE** | : | |
| **AUTHORITY,** | : | |
| **Defendants.** | : | |

**MEMORANDUM AND ORDER**

THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Plaintiff Lebanon Farms Disposal, Inc. is a waste collector operating in and around Lebanon

County. (Doc. No. 88 ¶¶ 1-3) Defendants are the County of Lebanon and the Greater Lebanon

Refuse Authority. Plaintiff claims that Defendants' waste flow control scheme discriminates against

interstate commerce and seeks a declaratory judgment striking the flow control as unconstitutional, an

order enjoining the enforcement thereof (Count I), and the recovery of damages (Count II). Plaintiff

also asserts a § 1983 First Amendment retaliation claim against the GLRA (Count IV). Before the

Court are the following motions: (1) a motion for partial summary judgment filed by Plaintiff; (2) a

motion for summary judgment filed by the GLRA; and (3) a motion for summary judgment filed by the

County of Lebanon. The Court heard argument on the cross motions on May 5, 2006. The motions

are ripe for disposition.

**I.      Background**

Since 1988, with the Pennsylvania General Assembly's adoption of the Municipal Waste

Planning, Recycling and Waste Reduction Act, 53 Pa. Cons. Stat. Ann. §§ 4000.101-4000.1904

("Act 101"), counties have been charged with the responsibility of planning and coordinating municipal

waste disposal and for ensuring adequate landfill capacity through a ten year planning process.[1]  The

County of Lebanon satisfied its Act 101 obligations by adopting a Municipal Waste Management Plan

covering the years 1990 through 2000 ("1990 Plan").  Lebanon's comprehensive plan created a

municipal authority, the Greater Lebanon Refuse Authority ("GLRA" or "the Authority"), to manage

waste generated in Lebanon County.  After the Department of Environmental Resources ("DER")[2]

approved the 1990 Plan, the County implemented the plan on June 6, 1991 with the adoption of the

Lebanon County Municipal Waste Management Ordinance No. 15 ("Ordinance 15") (Attachment A).

Ordinance 15 establishes a licensing and waste flow control scheme regulating all municipal waste

---

[1] Under Act 101, counties are required to provide for the safe and adequate disposal of waste generated within their borders.  Counties are required to demonstrate compliance by submitting a Municipal Waste Management Plan.  53 Pa. Cons. Stat. Ann. §§ 4000.501 - 4000.502.  Counties may designate for a ten-year period the facilities at which waste generated within their borders will be processed or disposed.  53 Pa. Cons. Stat. Ann. § 4000.303(d).  The facilities designated by a county, and the process by which they are chosen, must be set out in the Municipal Waste Management Plan. 53 Pa. Cons. Stat. Ann. § 4000.502(f).  The designation process must be "fair, open and competitive". 53 Pa. Cons. Stat. Ann. § 4000.502(f)(2).  The plan must be reviewed by an advisory committee -- made up of representatives from the county's municipalities, civic groups, and local industries -- and be made available for public comment during at least one public hearing.  53 Pa. Cons. Stat. Ann. § 4000.503(c).  After adoption by the county, the plan must be ratified by fifty percent of the municipalities in the county, representing at least fifty percent of the population.  53 Pa. Cons. Stat. Ann. §§ 4000.503(d); 504(c).  Finally, the County Plan must be submitted to the Department of Environmental Resources for approval.  53 Pa. Cons. Stat. Ann. § 4000.505(a).

[2] In 1995, Pennsylvania Governor Tom Ridge separated DER into two agencies: the Department of Conservation and Natural Resources, and the Department of Environmental Protection ("DEP").  Although the DEP currently administers municipal waste disposal programs, the Court will reference DER as the enforcement agency in this opinion.

generated within the county.  (Attachment A, Ordinance 15 §§ 2-3).  It requires that any waste

collectors within the county obtain a license from the GLRA for that purpose.  Id. at § 2(a).  Regarding

waste flow control, the ordinance provides in pertinent part:

> (a) Except as provided in (b) and (c) below, all Regulated Municipal
> Waste shall be delivered to a Designated Facility.

> (b) Delivery of Regulated Municipal Waste[3] to other sites pursuant to
> the Plan may occur only as permitted by rule, regulation, ordinance, or
> order duly issued by the Authority.

> (c) Nothing herein shall be deemed to prohibit Source Separation or
> Recycling or to affect any sites at which Source Separation or
> Recycling may take place.

Id. § 3.  A "Designated Facility" is defined as:  "Any municipal waste storage, collection, transfer,

processing, or disposal facility or site constructed, owned, or operated by or on behalf of the

Authority."  Id. § 1.  Ordinance 15 grants GLRA the authority to regulate waste disposal in the county

by licensing waste haulers and enforcing the waste flow control scheme.  Ordinance 15 also grants

---

[3] "Regulated Municipal Waste" is defined in Ordinance 15 as:
> Any solid waste generated or collected within the County which is
> garbage, refuse, industrial lunchroom or office waste and other material,
> including solid, liquid, semisolid or contained gaseous material, resulting
> from operation of residential, municipal, commercial or institutional
> establishments and from community activities and any sludge not
> meeting the definition of residual or hazardous waste under Act 97 from
> a municipal, commercial or institutional water supply treatment plant,
> wastewater treatment plant or air pollution control facility.  The term
> does not include Source Separated Recyclable Materials.

(Attachment A, Ordinance 15, § 1).

GLRA the authority to identify the designated waste facility, set "tipping fees"[4], and adopt and enforce regulations prohibiting the disposal of waste at any other facility. Id. § 4. Ordinance 15 remains in effect in Lebanon County to the present day as originally enacted.

Pursuant to the authority granted to it under Ordinance 15, GLRA adopted regulations governing waste disposal in Lebanon County. The GLRA amended these regulations most recently on July 5, 2005 ("GLRA Regulations") (Attachment B). The only Designated Facility for Lebanon County waste is the GLRA landfill located at 1610 Russell Road, Lebanon, PA 17046. (Doc. Nos. 92 ¶ 7; 88 ¶ 8.) The GLRA Regulations provide that:

> The Greater Lebanon Refuse Authority Landfill is the designated site for disposal of municipal waste and construction/demolition waste generated in Lebanon County by the 2000 Lebanon County Solid Waste Management Plan. All Regulated Municipal Waste collected by a commercial waste service, shall be transported directly from the point of collection to the GLRA facility or other approved point of delivery in accordance with these Rules and Regulations. Any intervening transfer, unloading, processing, sorting, salvaging, scavenging or reuse is prohibited.
>
> * * *
>
> Notwithstanding any provisions in these Rules and Regulations to the contrary, GLRA may change the site designation for any Waste.

(Attachment B at 14.) The tipping fee at the GLRA landfill for residential and construction/demolition waste is $62.70 per ton.[5] (Id. at 25.) The July 5, 2005 regulations allow municipal waste to be

---

[4] Tipping fees are the rates that a disposal facility or transfer station charges the hauler who deposits waste at the facility. See Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County, 48 F.3d 701, 707 n.10 (3d Cir. 1995) ("Atl. Coast I").

[5] According to the 2000 Plan, a $15.00 per ton surcharge is built into this fee to pay for Lebanon County recycling programs, administration and enforcement of the waste flow control scheme,

transported to an "approved point of delivery" other than the GLRA site, however no other approved

point of delivery is named in the regulations, nor is there a process by which an additional facility might

be named.[6]  (Id. § V; Def. Ex. J at 171; Doc. Nos. 88 ¶ 60; 112 ¶ 60.)  The penalty for transporting

Lebanon County waste to any location other than the GLRA landfill without the "prior written approval

of GLRA" is a $2,000.00 fine per occurrence.  (Attachment B, GLRA Regulations § X(3).)  GLRA

actively enforces the waste flow control and fined Plaintiff twice for transporting Lebanon County waste

to a facility other than the designated GLRA facility.[7]

Prior to the expiration of the 1990 Plan, Lebanon County developed the Lebanon County

Municipal Waste Management Plan 2000 to 2010 ("2000 Plan").  (Def. Ex. D.)  Noting the dictates of

C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 511 U.S. 383 (1994), the 2000 Plan

recommended that Ordinance 15 be amended to establish procedures for:  allowing interstate waste

shipments; reviewing out-of-state facilities "to assure the responsible disposal of Lebanon County

[Municipal Solid Waste]"; and ensuring that GLRA can collect a fee on each ton of Lebanon County

waste taken out-of-state for disposal.  (Def. Ex. D, 2000 Plan, § 4.3.2; see also Plan Attachment 2 §

A2.1.2 (discussing its recommendations)).  Under this proposed new flow control system:

Any out-of-state disposal facility, or hauler, applying for contractual

---

and environmental costs associated with maintaining closed landfill sites in Lebanon County.  (Doc. Nos. 92 ¶ 34; 94 at 13; Def. Ex. D, 2000 Plan at 47.)

[6] Defendants allege that since 1990 one application was filed, but the party withdrew the application prior to the approval process.  (Doc. No. 110, Ex. 1 ¶ 69.)

[7] Defendants argue that this action is merely Plaintiff's response to being caught "red-handed" violating the waste flow control.  (Doc. No. 94 at 33.)  However, Plaintiff's alleged violation of the ordinance is not material to this Court's constitutional analysis of the flow control ordinance.

> approval to dispose of Lebanon County municipal waste at an out-of-
> state facility will be required to provide the same capacity assurance to
> the County which the GLRA has provided and thereby reduce the
> capacity assurance which the GLRA has provided the County for the
> remainder of the assured term.  The out-of-state facility will also be
> required to pay their fair share of recycling, enforcement, administrative,
> and environmental mitigation costs which would otherwise be paid by
> the generators as part of the GLRA tipping fee.

(2000 Plan, § 4.3.1, Attachment 2, A2-6 through A2-10.)  In order to implement the plan into law, the

2000 Plan provided two "implementing documents".  (Id. at A9-2.)  Attached to the plan was a

proposed Municipal Waste Management Agreement between Lebanon County and GLRA  for the

new ten-year term.  (Id. at A9-7.)  With the agreement was also a suggested amendment to Ordinance

15 that included, inter alia, a provision for the out-of-state transportation of county waste.  (Id. at  A9-

10, A9-20.)  According to the plan, the waste management agreement is necessary to implement the

recommendations of the 2000 Plan, and the amended ordinance "is recommended to be implemented

to provide a legal basis for the waste management agreement."  (Id. at A9-2.)  The 2000 Plan was

ratified by the Lebanon County municipalities and approved by DER.  However, Ordinance 15 was

never amended and the record contains no evidence that the waste management agreement was

executed by Defendants.

## II.    Standard of Review

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56.

A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis which would allow a reasonable fact-finder to return a verdict for the non-moving party.  Id. at 249.  The nonmoving party receives the benefit of all reasonable inferences.  Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir. 1995).

Once the moving party has shown that there is an absence of evidence to support the claims of the non-moving party, the non-moving party may not simply sit back and rest on the allegations in the complaint.  Instead, it must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  Summary judgment should be granted where a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden at trial."  Id. at 322.

## III.   Discussion

### A.   Dormant Commerce Clause Claim

Plaintiff alleges that Lebanon's flow control ordinance and regulations violate the Commerce Clause of the United States Constitution.  The Commerce Clause grants to Congress the affirmative power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  "Although the Clause thus speaks in terms of powers bestowed upon Congress, the [Supreme] Court long has recognized that it also limits the power of the States to erect barriers against interstate trade."  Lewis v. BT Inv. Managers, Inc., 447 U.S. 27, 35 (1980).  The negative or dormant aspects of the Commerce Clause that limit state authority apply to subject areas in which "Congress has not affirmatively acted to either authorize or forbid the challenged state activity."  Norfolk S. Corp. v.

Oberly, 822 F.2d 388, 392 (3d Cir. 1987).  Thus, any state regulation of interstate commerce is

subject to scrutiny under the dormant Commerce Clause unless such regulation has been preempted or

expressly authorized by Congress.  Atl. Coast I, 48 F.3d at 710.

"The initial question in a dormant Commerce Clause case is whether the state regulation at issue

discriminates against interstate commerce 'either on its face or in practical effect.'"  Cloverland-Green

Spring Dairies, Inc. v. Pa. Milk Mktg. Bd., 298 F.3d 201, 210 (3d Cir. 2002) (quoting Maine v.

Taylor, 477 U.S. 131, 138 (1986)).  It is well established that waste and waste disposal are part of

interstate commerce.  Carbone, 511 U.S. at 389-91; Chem. Waste Mgmt., Inc. v. Hunt, 504 U.S.

334, 340 n.3 (1992).  The issue then is the manner in which Ordinance 15 and the GLRA regulations

affect interstate commerce; i.e. "whether it regulates evenhandedly with only incidental effects on

interstate commerce, or discriminates against interstate commerce."  Or. Waste Sys., Inc. v. Dep't of

Envtl. Quality of Or., 511 U.S. 93, 99 (1994) (internal citation and quotation marks omitted).  The

Supreme Court has distinguished between state regulations that affirmatively discriminate against

interstate commerce and those regulations that only incidentally burden interstate transactions.  Taylor,

477 U.S. at 138.

Regulations in the first group discriminate against interstate trade "either on its face or in

practical effect" and are subjected to strict scrutiny.  Id.  "[S]tate laws that are facially neutral but have

the effect of eliminating a competitive advantage possessed by out-of-state firms trigger [strict]

scrutiny." Cloverland, 298 F.3d at 211.  "[I]f a state regulation has the effect of protecting in-state

businesses by eliminating a competitive advantage possessed by their out-of-state counterparts, [strict]

scrutiny applies."  Id. at 212 (citing Baldwin v. G. A. F. Seelig, Inc., 294 U.S. 511 (1935) and Hunt v.

Washington State Apple Adver. Comm'n, 432 U.S. 333 (1977)).  An ordinance may still be invalid

even if it "favors only a single or finite set of businesses."  Harvey & Harvey, Inc. v. County of Chester,

68 F.3d 788, 798 (3d Cir. 1995).

On the other hand, regulations in the second group are prohibited only if the burdens they

impose on interstate commerce are "clearly excessive in relation to the putative local benefits."  Pike v.

Bruce Church, Inc., 397 U.S. 137, 142 (1970).  If the Court finds that the flow control scheme

regulates evenhandedly, but nevertheless "incidentally burden interstate commerce by making it more

difficult for out-of-state dealers to attract new business in a market dominated by in-state dealers," then

the Court must examine the regulations' constitutionality under the Pike balancing test.  Cloverland, 298

F.3d at 215.  Under Pike, state regulations which serve a legitimate local interest and do not patently

discriminate against out-of-state firms, "will be upheld unless the burden imposed on [interstate]

commerce is clearly excessive in relation to the putative local benefits."  Pike, 397 U.S. at 142.

    1.    Strict Scrutiny

The burden of showing that a statute discriminates rests on the party challenging the statute.

Harvey, 68 F.3d at 802.  Plaintiff argues that Ordinance 15 and the GLRA regulations restrict the

disposal of county waste to a single in-state facility and therefore discriminate against out-of-state

interests.  (Doc. No. 89 at 20-29.)  The Court is guided on this issue by the Third Circuit's decision in

Harvey & Harvey v. County of Chester, 68 F.3d 788, 801-07 (3d Cir. 1995).  In Harvey, the Third

Circuit examined Commerce Clause challenges to the flow control schemes of Chester and Mercer

Counties, Pennsylvania, both of which were enacted pursuant to Act 101.  Id. at 791.  After examining

solid waste Commerce Clause jurisprudence, the Third Circuit held that:

> [l]ocal government acts that categorically favor all in-state providers
> clearly violate the dormant Commerce Clause.  Acts that concentrate
> waste hauling or processing business in the hands of a single or finite set
> of in-state providers are also suspect from a dormant Commerce
> Clause perspective. . . .  [However,] the fact that the designated sites
> happened to be in-state does not, standing alone, establish that the flow
> control schemes discriminate against interstate commerce.

Id. at 801.  The Third Circuit found that "a local authority could choose a single provider -- without

impermissibly discriminating against inter-state commerce -- so long as the selection process was open

and competitive and offered truly equal opportunities to in- and out-of-state businesses."  Id.  In order

for courts to determine whether out-of-state interests can compete on a level playing field or whether

the flow control scheme actually discriminates against interstate commerce such as to trigger strict

scrutiny analysis, "the court must closely examine the following:  (1) the designation process; (2) the

duration of the designation; and (3) the likelihood of an amendment to add alternative sites."  Id.  "If the

manner in which the county implemented its flow control system, particularly the process used to

designate the ten year providers, favored in-county interests, then the flow control ordinance has the

effect of discriminating against interstate commerce and must be subject to the strict scrutiny test

enunciated in [Maine v. Taylor, 477 U.S. 131 (1986),] and [Philadelphia v. New Jersey, 437 U.S. 617

(1978)]."  Id. at 805.  In its evaluation of the counties' designation processes, the Court examined the

openness of the processes, how the meetings were advertised, the counties' economic interests in the

designated facilities, and whether established local businesses won the designations.  Id. at 805-08.

Counties can rebut a "putative showing of discrimination by presenting evidence demonstrating that the

designation process was open, fair, and competitive, i.e., determined by objective criteria which do not

have the effect of favoring in-state interests."  Id. at 802-03.

Defendants' waste flow control fails the <u>Harvey</u> court's three part test.  Defendants concede that Lebanon County did not conduct an open bidding process prior to choosing the GLRA site as the sole designated facility for disposal of all regulated municipal waste.[8]  (Doc. No. 94 at 13.)  The Lebanon County designation process considered no other facility beyond the GLRA site and there is no evidence to support a finding that the county is likely to amend the waste flow control to include non-local sites, as the GLRA landfill has been the sole designated site since the implementation of the flow control.  (Doc. Nos. 88, ¶ 8.)

Defendants do not argue that their bidding process was fair.  (Doc. No. 94 at 13.)  Defendants maintain that Ordinance 15 is not unconstitutional because, in effect, it does not really  mean what it says.  Although never amended or superceded, Defendants argue that it is not Ordinance 15, but rather Lebanon County's 2000 Plan that governs the collection and flow of waste in and from Lebanon County.  Under this Plan, argue Defendants, GLRA has a procedure permitting the transportation of Lebanon County waste to out-of-state facilities and therefore the waste flow control does not violate the Commerce Clause.  (<u>Id.</u> at 13-14.)  GLRA recognizes Plaintiff's "absolute, unequivocal right to take [municipal waste]" to an out-of-state facility.[9]  Defendants represented that GLRA allows any hauler to transport waste out-of-state so long as the hauler reports the tonnage of waste to GLRA and pays a $8.18 per ton fee to cover the "cost of closing down and monitoring old [Lebanon county]

---

[8] The Court notes that the 2000 Plan discusses conducting an open and fair designation process as a means to come into compliance with <u>Carbone</u> and its progeny.  (Def. Ex. D, 2000 Plan at A2-7.)

[9] Defendants' position is unequivocal, as expressed at argument.  (May 5, 2006 Transcript at 32-33) ("what will happen if someone wants to take . . .  municipal solid waste out of Lebanon County . . . [?]  The answer is 'go.'  The answer has been 'go' since the beginning of this litigation").

landfills."[10]  (Tr. 33.)

This alleged policy stands in direct conflict with the clear language of Ordinance 15 and

GLRA's regulations, which mandate that all municipal solid waste be transported to a GLRA

designated facility and provide no exception for out-of-state transport.  Ordinance 15 requires that "all

Regulated Municipal Waste shall be delivered to [a disposal facility operated by GLRA]."  (Attachment

A, Ordinance 15 § 3.)  GLRA's regulations mandate that "[a]ll regulated Municipal Waste . . . shall be

transported directly from the point of collection to the GLRA facility or other approved point of

delivery in accordance with these Rules and Regulations."  (Attachment B, GLRA Regulations at 14.)

Notwithstanding Defendant's argument that "[a]ny site out-of-state is a designated site" (Tr. 41), the

only designated site referenced in the regulations is the GLRA landfill (Attachment B at 14).  Moreover,

the regulations provide no procedure for a hauler to follow should it intend to transport municipal waste

to an out-of-state facility, nor is there any reference to a $8.18 per ton fee.  The Court finds no support

in the flow control language of Ordinance 15 and the regulations for the policy, represented to be in

effect, that permits the export of waste beyond the Commonwealth's borders.

In support of its argument, Defendants point to the voluminous 2000 Plan.  From Defendants'

perspective, the flow control found in Ordinance 15 and the GLRA regulations represent merely one

component of a comprehensive, evenhanded regulatory system designed to address the county's waste

disposal needs, the cornerstone of which is the 2000 Plan.  (Tr. 28-30.)  Defendants argue that the

_____

[10] Plaintiff does not appear to dispute that GLRA may impose a reasonable "administrative fee"
for the transportation of waste.  (Tr. 55.)  Whether $8.18 per ton is a reasonable fee is not addressed
by either party.

2000 Plan has the force of law and therefore amended Lebanon County's flow control system upon

adoption.  (Tr. 28.)  Defendants ask this Court to interpret the challenged flow control language of

Ordinance 15 and the GLRA regulations as though the language of the 2000 Plan was incorporated

therein.

Plaintiff counters that it is not challenging the 2000 Plan because the plan does not have the

force of law.  (Doc. No. 118 at 15.)  Plaintiff argues that the Court should not examine the flow control

that was recommended in the plan, but rather examine the flow control that is actually contained within

Ordinance 15 and the GLRA Regulations.  The Court finds that Plaintiff's approach is proper.

Defendant's assertion that the 2000 Plan is self-executing is contrary to Pennsylvania law and

the language of the plan itself.  Pennsylvania law requires waste management plans to be implemented

by county ordinance.  53 Pa. Cons. Stat. Ann. §§ 4000.502(j); 4000.502(l); 4000.513(a).[11]

Moreover, the express language of the 2000 Plan provides that:

> This waste management plan is . . . written with the intent of providing
> program guidance for Lebanon County during the [2000 to 2010]
> years.  This plan should not be interpreted as being absolute; that is, all
> identified programs do not have to be implemented once the plan is
> approved.  Any program can be changed at any time if it is decided to

---

[11] The statutory language of Act 101 assumes that the counties will implement the waste
management plans through some sort of legal instrument, such as an ordinance or contract.  For
example, Pennsylvania law requires that "within one year following approval of a plan . . . the county
shall cause to be submitted to the department copies of all executed ordinances, contracts or other
requirements to implement its approved plan . . . ."  53 Pa. Cons. Stat. Ann.
§ 4000.513(a) (emphasis added).  Act 101 also requires that each waste management plan "include
any proposed ordinances, negotiated contracts or requirements that will be used to insure the operation
of any facilities proposed in the plan.."  53 Pa. Cons. Stat. Ann.
§ 4000.502(j).  The Court finds no support in the law for Defendants' argument that the plans are self-
executing.

be in the best interest of Lebanon County.

(Def. Ex. D, 2000 Plan at 2.)  Attached to the plan is a recommended waste management agreement

between Lebanon County and GLRA for the years 2000-2010 and a recommended amended

Ordinance 15 to be implemented after adoption of the plan.  (Def. Ex. D, 2000 Plan, Attachment 9.)

The 2000 Plan explains the recommended agreement and amended Ordinance 15 as follows:

> A waste management agreement between the County and the GLRA
> has been in effect for the duration of the previous 1990 Waste
> Management Plan.  A similar agreement is required to implement this
> [the 2000] plan.  The recommended agreement is included in Appendix
> A.  This agreement is needed to establish the GLRA as the entity
> responsible for waste management in Lebanon County.  From this
> agreement, all programs, identified in this plan, can be implemented by
> the GLRA.
>
> * * *
>
> As part of the agreement, a County ordinance is recommended to be
> implemented to provide a legal basis for the waste management
> agreement.  A recommended ordinance (County ordinance #15) is
> included with the waste management agreement in Exhibit 1 of
> Appendix A.

(Id. at A9-2.)  In the agreement, the County agrees to designate GLRA as the "primary Designated

Facility for the County" and delegate to GLRA "all rights, duties and obligations of the County under

Act 101 for Municipal Waste planning and for implementation of the 2000 Plan."  (Id. at A9-10.)  The

agreement further mandates that "[t]he County shall adopt and enact the [proposed] Lebanon County

Municipal Waste Management Ordinance" attached as Exhibit 1 to the agreement.  (Id. at A9-8, A9-9,

A9-10.)  The record contains no indication that Defendants signed the attached agreement and the

parties agree that the amended Ordinance 15 was never implemented.  The Court finds no support in

the law or the language of the 2000 Plan for Defendants' argument that the plan is self-executing.[12]

Accordingly, the Court finds no support in the record for Defendant's representation that even in the absence of an implementing ordinance requiring it to do so, Lebanon will freely administer the flow control plan so as not to violate the dormant Commerce Clause.[13]  Defendants' failure to actually implement the recommendations of the 2000 Plan or otherwise enact the interstate procedures represented to this Court is fatal to Defendants' argument that out-of-state waste transport is allowed under the challenged flow control.  The flow control provisions of Ordinance 15 and the GLRA regulations as written contain no allowance for the out-of-state transport of municipal waste and severally punish any hauler who attempts to dispose of municipal waste through the interstate market. (Attachment A, Ordinance 15, § 3; Attachment B, GLRA regulations, §§ V, X(3).)

Moreover, the effect of the flow control has resulted in the complete surcease of Lebanon

---

[12] The Court declines to address whether the flow control scheme contained in the 2000 Plan would run afoul of the dormant Commerce Clause, as the Court finds that the recommended scheme was never implemented and is not before the Court.

[13] If the Court accepted Defendants' argument, waste haulers would face the impossible task of complying with three different conflicting flow control schemes:  the scheme created by Ordinance 15 and related regulations; the scheme recommended in the 2000 Plan; and the ethereal scheme proffered by Defendants during this action.  Defendants represented that under the county's flow control system, a hauler need only inform GLRA of the tonnage it transports out of state and pay $8.18 per ton, to cover county landfill closure costs.  (Tr. 32-33.)  Defendants described a hauler's right to take waste out of Pennsylvania as "absolute" and "unequivocal", not merely a special exception to the flow control scheme.  (Tr. 33.)  However, under the flow control scheme recommended by the 2000 Plan, haulers and out-of-state facilities would be required to apply for "contractual approval" before haulers were given permission to dispose of municipal waste at an out-of-state facility.  (Def. Ex. D at 48.)  The plan's scheme would further impose an obligation on out-of-state facilities to provide capacity assurance to the county and would require out-of-state facilities to pay "recycling, enforcement, administrative, and environmental mitigation costs", which the plan estimates at $15.00 per ton.  (Id. at 47-48.)  This would place waste haulers in an impossible position.

County waste leaving the state.  (Def. Ex. J at 171; Doc. Nos. 88 ¶ 60; 112 ¶ 60.)  It is undisputed that

no Lebanon County waste has lawfully been transported out-of-state since the imposition of the flow

control scheme.  (Id.)  While a locality "has every right to protect its residents' pocketbooks as well as

their environment," it may not do so at the expense of or by discriminating against interstate commerce.

Philadelphia, 437 U.S. at 626-27.  Lebanon County's flow control, as enacted, impermissibly "hoards

solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility."

Carbone, 511 U.S. at 409; Southcentral Pa. Waste Haulers Assoc. v. Bedford-Fulton-Huntingdon

Solid Waste Auth., 877 F. Supp. 935, 943 (M.D. Pa. 1995) (A limited exception "permitting waste to

be taken across state or county lines or to a facility other than the Authority landfill does not qualify the

discriminatory character of the Authority rules. . . .  [T]he exception 'merely reduce[s] the scope of the

discrimination; for all categories of waste not excepted by the regulations, the discriminatory ban

remain[s] in place')(quoting Fort Gratiot Sanitary Landfill v. Mich. Dep't of Natural Resources, 504

U.S. 353, 362 (1992)).

     The undisputed record demonstrates that Lebanon County conducted no open and fair

designation process, and considered no other facility beyond the GLRA site.  The designation process

clearly favored the in-state GLRA site over all other interests and the flow control prohibits out-of-state

facilities from competing in the Lebanon County market.  Based upon the undisputed facts on record,

Defendants' flow control discriminates against interstate commerce.  Accordingly, the Court must

evaluate the challenged flow control under a strict scrutiny analysis.

        2.    Alterative Available Means

     Because the flow control discriminates against interstate commerce, the burden shifts to

Defendants to "demonstrate, under rigorous scrutiny, that [they have] no other means to advance [their] legitimate local interest." Carbone, 511 U.S. at 409; see also Or. Waste Sys., 511 U.S. at 99 ("If a restriction on commerce is discriminatory, it is virtually per se invalid") (citations omitted). Both the 1990 Plan and the 2000 Plan cite revenue generation and environmental concerns as the purpose for the flow control.[14] (Pl. Ex. K, 1990 Plan, §§ 7.3, 7.5; Def. Ex. D, 2000 Plan, § 4.3.1.) However, neither revenue generation nor environmental concerns can justify discrimination against interstate commerce. Carbone, 511 U.S. at 393-94; see also Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders of Atl. County, 112 F.3d 652, 666-67 (3d. Cir. 1997) ("Atl. Coast II") (holding that "the State of New Jersey cannot protect the local waste disposal market, and thereby exclude out-of-state competitors, in order to use inflated revenues to finance the substantial debts of its waste management districts").

In Carbone, as in this case, the municipality asserted that "special financing [was] necessary to ensure the long-term survival of the designated facility." Id. at 394. The Supreme Court rejected this argument, finding that the local municipality could "subsidize the [waste] facility through general taxes or

---

[14] The "Flow Control" section of the 2000 Plan states:

> Waste flow control assures the revenue stream for planning and implementation of public facilities which will, in turn, assure the required ten (10) years allocated capacity. Waste flow control also aids in assuring the proper disposal of municipal waste, the mitigation of future environmental liability, and compliance with State and Federal laws, including recycling mandates and implementation of all aspects of [this Plan]. . . . The ability of the GLRA to provide the assurance of ten (10) more years of adequate permitted capacity is conditioned upon an assured revenue stream from tip fees with which to pay for that capacity.

(Def. Ex. D, 2000 Plan, § 4.3.1.)

municipal bonds." Id. ("[H]aving elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State"). The Court found that "revenue generation is not a local interest that can justify discrimination against interstate commerce." Id. The Carbone court also found that a discriminatory flow control ordinance was not the only means to address the municipality's environmental concerns. Id. at 393. The Court held that states and local municipalities can enact environmental safety regulations as an alternative to a discriminatory flow control ordinance. Id. Moreover, attempts to regulate facilities outside of a municipality's jurisdiction is an unconstitutional extension of its police powers. Id. ("State and localities may not attach restrictions to exports or imports in order to control commerce in other States"). Defendants do not argue that the current flow control, as enacted by Ordinance 15 and the GLRA regulations, is the only available means to fulfill their waste mandate under Act 101. The 2000 Plan recommended several alternatives, including conducting a fair and open bidding process for site designation. (Def. Ex. D, 2000 Plan at A2-7.) Also, Defendants proffer no other interests in justification of their discriminatory flow control scheme. Since other non-discriminatory means exist to advance Lebanon County's interests, the flow control scheme fails strict scrutiny. Accordingly, Defendants' flow control scheme is unconstitutional and cannot be enforced.

3.      Severability

When a federal court is called upon to invalidate a state statute, the severability of the constitutional portions of the statute are governed by state law, here the law of Pennsylvania. Planned Parenthood of Southeastern Pa. v. Casey, 978 F.2d 74, 77 (3d Cir. 1992) (modified on other

18

grounds).  Generally, the severability of a statute is a question of legislative intent as to the specific

provision.  Rappa v. New Castle County, 18 F.3d 1043, 1072 (3d Cir. 1994).   Pennsylvania law

favors severability.  Contractors Assn. of Eastern Pa. v. City of Philadelphia, 6 F.3d 990, 997 (3d Cir.

1993).  Additionally, there is a presumption in favor of severability where, as here, the ordinance and

regulations contain severability provisions.    Contractors Assn. of Eastern Pa., 6 F.3d at 997.

(Attachment A, Ordinance 15, § 12; Attachment B, July 5, 2005 GLRA Regulation, § XV.)  Equipped

with these principles, the Court must decide whether the flow control provisions of Ordinance 15 and

the GLRA regulations "are distinct and not so interwoven as to be inseparable."  Saulsbury v.

Bethlehem Steel Co., 196 A.2d 664, 666 (1964).  The Court finds that the unconstitutional flow

control provisions are not inseparable from the ordinance and regulations.  Only section 3 of Ordinance

15 concerns flow control, whereas the remainder of the ordinance establishes a distinct licensing

requirement for county waste haulers.  (Attachment A, Ordinance 15, § 3.)  Similarly, while sections V

and X(3) of the GLRA regulations provide for flow control of waste, the remainder of the regulations

concern licensing waste haulers and the general operations of the GLRA facility.  (Attachment B,

GLRA Regulations §§ V and X(3).)  The flow control's unenforceability does not affect Defendants'

power to enforce the remainder of Ordinance 15 or the regulations.  Ordinance 15 section 3 and

GLRA Regulations sections V and X(3) are severable.  Accordingly, the ordinance and regulations

remain enforceable except for the flow control provisions found unconstitutional herein.


    4.    <u>Standing</u>

    The test for assessing whether a party satisfies prudential standing requires that:

> (1) a litigant assert his [or her] own legal interests rather than those of
> third parties, (2) courts refrain from adjudicating abstract questions of
> wide public significance which amount to generalized grievances, and
> (3) a litigant demonstrate that her interests are arguably within the zone
> of interests intended to be protected by the statute, rule or constitutional
> provision on which the claim is based.

Oxford Assocs. v. Waste Sys. Auth. of E. Montgomery County, 271 F.3d 140, 145-46 (3d Cir.

2001).  In its July 9, 2004 Order adjudicating Defendants' motions to dismiss, the Court found that

Plaintiff had both constitutional standing and prudential standing to prosecute the instant civil action.

(Doc. No. 58 at 6-8.)  Defendants once again challenge Plaintiff's prudential standing, asserting that

Plaintiff fails the third "zone of interests" prong of Oxford.  271 F.3d at 145-46.  Specifically,

Defendants argue that Plaintiff lacks standing to challenge the flow control because no evidence exists

that Plaintiff engaged or planned to engage in interstate commerce.  (Doc. Nos. 94, 95.)  As the Court

noted in its July 5, 2004 Order, the Third Circuit Court of Appeals "advocate[s] a 'liberal' employment

of the zone of interests test, explaining that it is 'not meant to be especially demanding.'"  Id. at 146

(quoting Davis v. Philadelphia Hous. Auth., 121 F.3d 92, 98, 101 (3d Cir. 1997).  As noted in this

Court's July 5, 2004 Order, Plaintiff meets the prudential standing requirements because as a waste

hauler participating in the stream of commerce affected by the ordinance and regulations, it has asserted

its own right to access interstate waste disposal markets and is clearly within the zone of interests

protected by the Commerce Clause.  (Doc. No. 58.)  Accordingly, Plaintiff has standing to prosecute

this action.

        5.      Permanent Injunction

        In Count I of the Complaint, Plaintiff seeks an injunction permanently enjoining Defendants from

enforcing the flow control provisions of Ordinance 15 and the GLRA regulations.  (Doc. No. 1.)  The standards for a permanent injunction are essentially the same as for a preliminary injunction, except that the plaintiff must show actual success on the merits, not a mere likelihood of success.  Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 (1987).  The following four factors govern the Court's evaluation of whether to issue injunctive relief:  (1) whether the plaintiff has demonstrated actual success on the merits; (2) whether the plaintiff will be irreparably injured by the denial of the requested relief; (3) whether granting the preliminary relief will result in greater harm to the defendants; and (4) whether granting the preliminary relief will be in the public interest.  Am. Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ., 84 F.3d 1471, 1477 n.2 (3d Cir. 1996) (en banc).

In the instant case, the factors weigh in favor of permanent injunction.  Plaintiff has demonstrated actual success on the merits of its Commerce Clause claims.  Further, deprivation of a constitutionally protected right constitutes irreparable injury.  Elrod v. Burns, 427 U.S. 347, 373-374 (1976).  Since the flow control provisions of Ordinance 15 and the GLRA regulations are unconstitutional as a matter of law, enjoining the enforcement of the unconstitutional provisions will not result in further harm to Defendants or go against the public interest.  Accordingly, the Court will declare Section 3 of the Lebanon County Municipal Waste Management Ordinance No. 15 (Attachment A) and Sections V and X(3) of the July 5, 2005 GLRA Regulations (Attachment B) unconstitutional and permanently enjoin Defendants from enforcing the same.

6.      Damages

Plaintiff asserts that Defendants' unconstitutional flow control scheme has forced it to pay

inflated tipping fees at the GLRA facility.  (Doc. No. 89.)  In support of its claim for damages, Plaintiff proffers the expert report of Herbert Hogg, CPA.  (Pl. Ex. P.)  In his report, Mr. Hogg opines that Plaintiff would have saved $ 956,229.56 if Defendants' flow control did not prohibit it from patronizing a facility in Lisburn, Ohio during the years 2000-2004.  (Id.)  Defendants challenge not only the amount of damages alleged, but also Plaintiff's entitlement to put forth any evidence of damages at all. Defendants argue that Plaintiff produced no evidence of its alleged damages during discovery and should thus be prohibited from producing any evidence on damages at trial.  (Doc. No. 109 at 31.) Defendants do not brief this issue, choosing instead to file a Motion in Limine enunciating their position at the appropriate stage of this litigation.  (Id.)

Without speaking on the admissibility of Plaintiff's evidence on damages – an issue that has not been properly briefed by the parties – the Court finds that Plaintiff has proffered enough evidence that a reasonable jury could find that Plaintiff incurred specific damages due to Defendants' unconstitutional flow control system.  As this issue represents a disputed material fact, summary judgement on damages is improper.  Accordingly, the Court will enter judgment in favor of Plaintiff and against Defendants on Count I (declaratory and injunctive relief) of the Complaint, but will defer entering judgment on Count II (damages).

### B.  First Amendment Retaliation Claim

Count IV of Plaintiff's Complaint is a claim against GLRA for First Amendment retaliation, brought pursuant to 42 U.S.C. § 1983.  "The Supreme Court has consistently held that an individual's constitutional right of access to court is protected by the First Amendment's clause granting the right to petition the government for grievances."  Id. at 161 (citing California Motor Transp. Co. v. Trucking

Unlimited, 404 U.S. 508, 510, (1972)).  Moreover, official retaliation for the exercise of any

constitutional right creates an actionable claim under Section 1983.  Id. (citing White v. Napoleon, 897

F.2d 103, 111-12 (3d Cir.1990).  To prevail on a First Amendment retaliation claim, a plaintiff must

prove that:  (1) it engaged in protected activity; (2) the government responded with retaliation; and (3)

the protected activity was the cause of the retaliation.  Anderson v. Davila, 125 F.3d 148, 162-63 (3d

Cir. 1997).  To fulfill the third prong, Plaintiff must show that the "protected activity was a substantial or

motivating factor in the alleged retaliatory action."  McGreevy v. Stroup, 413 F.3d 359, 364 (3d Cir.

2005).[15]

Plaintiff claims that GLRA assessed monetary penalties and otherwise targeted Plaintiff in order

to retaliate for Plaintiff's constitutional challenge to the ordinance and regulations.  (Doc. No. 1.)

Specifically, Plaintiff alleges that GLRA targeted Plaintiff's vehicles for monitoring, threatened license

revocation, and issued penalties against Plaintiff on March 18, 2003 and April 3, 2003 for allegedly

transporting county trash to the Pine Grove Landfill.  (Doc. No. 106 at 26-27.)  Plaintiff filed the

above-captioned civil action on April 23, 2003.  (Doc. No. 1.)

Defendants argue that Plaintiff's retaliation claims must fail as a matter of law because the

protected activity, filing the above-captioned civil complaint, occurred after the enforcement action,

---

[15] Plaintiff's reliance on Hill v. City of Scranton, 411 F.3d 118 (3d Cir. 2005) is misplaced.  In Hill, the Third Circuit found that the district court should not have granted summary judgment on the police officers' retaliation claim.  However, the Court "reject[ed] the officers' contention that courts may never grant summary judgment on either the second or third steps of [the First Amendment retaliation] analysis" finding that "[a]lthough we have often noted that the first prong of the First Amendment retaliation test presents questions of law for the court while the second and third prongs present questions of fact for the jury, only genuine questions of fact should be determined by the jury." Id. at 127 (emphasis in original).

penalties, and other actions complained of had already taken place.  (Doc. Nos. 94, 95.)  Plaintiff

argues that the actions were retaliatory in anticipation of Plaintiff's challenge to the flow control scheme

because GLRA knew of Plaintiff's objection to the flow control.  (Doc. No. 116.)        Plaintiff relies

upon Anderson v. Davila, 125 F.3d 148 (3d Cir. 1997), in support of its claim.  However, this reliance

is misplaced.  In Anderson, the Third Circuit found that the plaintiff's lawsuit fell within the access to

courts doctrine even though he had not yet filed suit at the time of retaliatory actions because he had

filed EEOC charges, his attorney had provided a written notice of his intent to file a claim, and the

newspaper had reported the impending lawsuit.  Anderson, 125 F.3d at 162.  The Anderson court

found that the above actions "were sufficient to implicate [Plaintiff's] right to petition the government"

for purposes of a § 1983 retaliatory action.  Id.  In the case at bar, Plaintiff cites no evidence to support

a finding that GLRA knew or anticipated the instant civil action, beyond Plaintiff's mere refusal to

execute the 2000 Plan.  Rather, the evidence of record supports a finding that Plaintiff decided to

prosecute the instant civil action only after GLRA had imposed the penalties. (Def. Ex. M, John Barry's

Deposition at 37.)  John Barry, secretary and treasurer of Plaintiff, testified at deposition as follows:

> Defendants:        At what point did you and other representatives of
>                    Lebanon Farms determine to enter into litigation?
>
> John Barry:        I believe it was after the fines and . . . surveillance and
>                    all.  We just, after a couple years, it gets old.  We
>                    wanted to do something with it, see what our legal
>                    obligations are, so we know how to grow the company.
>
> Defendants:        So it would have been sometime after April 3rd of
>                    2003?

John Barry:       I believe, yes.  I don't know the exact dates.

(Def. Ex. M at 37.)  Plaintiff offers no evidence to support a finding that GLRA knew a civil action was

forthcoming and preemptively retaliated through the flow control enforcement mechanism.  Based upon

the evidence on record, no reasonable fact finder could find that Plaintiff's intent to file the instant civil

action was the substantial or motivating factor for Defendant GLRA's alleged actions.  McGreevy, 413

F.3d at 364.  Accordingly, the Court must grant Defendants' motions for summary judgment on this

claim (Count IV).

**IV.**     **Order**

AND NOW, this 5th day of July, 2006, for the foregoing reasons, **IT IS HEREBY**

**ORDERED THAT** Plaintiff's Motion for Partial Summary Judgment is **GRANTED** in part as

follows:

> 1.     Judgment is **ENTERED** in favor of Plaintiff and against Defendants on Count I of the Complaint.
>
> 2.      Section 3 of the Lebanon County Municipal Waste Management Ordinance No. 15 (Attachment A) and Sections V and X(3) of the July 5, 2005 GLRA Regulations (Attachment B) are **DECLARED UNCONSTITUTIONAL**.
>
> 3.     Defendants are **PERMANENTLY ENJOINED** from enforcing Section 3 of the Lebanon County Municipal Waste Management Ordinance No. 15 (Attachment A) and Sections V and X(3) of the July 5, 2005 GLRA Regulations (Attachment B).

Defendants' Motions for Summary Judgment are **GRANTED** in part as follows: Count IV of

the Complaint is **DISMISSED**.  In all other respects, Defendants' motions are denied.

 

 

    S/  Yvette Kane
Yvette Kane
United States District Judge

Dated: July 5, 2006